UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SCOTT A. GERMANA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 23-30065-MGM |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, | * | |
| | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 54 and 58)

September 21, 2026

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Scott A. Germana ("Plaintiff") brought this action against Hartford Life and Accident Insurance Company ("Defendant"), challenging Defendant's denial of long-term disability ("LTD") benefits under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* The parties have filed cross-motions for summary judgment. For the following reasons, the court concludes Defendant's decision to deny Plaintiff LTD benefits was not arbitrary, capricious, or an abuse of discretion. The court will therefore grant Defendant's motion and deny Plaintiff's motion.

## II. BACKGROUND

Plaintiff worked as a registered nurse for Trinity Health Corporation, which provided LTD benefits under an insurance policy issued by Defendant and for which Defendant also served as the claims administrator. In April of 2018, Plaintiff stopped working; he was 54 years old at the time.

Plaintiff applied for workers' compensation benefits due to abdominal pain, but the claim was denied based on "lack of causation and lack of medical documentation." (Administrative Record ("A.R.") at 2724.) Thereafter, Trinity Health Corporation submitted an employer's application for LTD benefits for Plaintiff. In the employee's statement, Plaintiff identified "epiploic appendigitis/diverticulosis left, lower abdominal pain" as his first symptoms. (*Id.* at 2700.)

The LTD Policy defined "disabled" as:

> You are prevented from performing one or more of the Essential Duties of:
> 1) Your Occupation during the Elimination Period;
> 2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
> 3) After that, Any Occupation.

(*Id.* at 2764.) The Policy defined "Any Occupation" as "any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of: 1) the product of Your Indexed Pre-disability Earnings and the Initial Benefit Period Percentage; or 2) the Maximum Monthly Benefit." (*Id.*) In addition, the Policy required Plaintiff to provide "Proof of Loss," which it defined to include documentation of "the date Your Disability began," "the cause of Your Disability," "the prognosis of Your Disability," and "any and all medical information, including x-ray firms and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes." (*Id.* at 2760.) The Policy also stated that "[a]ll proof submitted must be satisfactory to [Defendant]." (*Id.*) Importantly, under the heading "Policy Interpretation: Who interprets the terms and conditions of The Policy?," the Policy states that Defendant has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy." (*Id.* at 2763.)

Plaintiff originally treated with Dr. Maurice Bernaiche, D.O., for pain management. Dr. Bernaiche provided an Attending Physician's Statement ("APS") on June 3, 2019. In the APS, Dr. Bernaiche listed thoracic spondylosis, lumbar spondylosis, and ankylosis spondylitis as Plaintiff's

conditions, and he stated Plaintiff could sit and stand for less than one hour at a time and three hours total, and walk less than one hour at a time and two hours total. (*Id.* at 2040-41.) Dr. Bernaiche listed an April 4, 2017 X-ray and March 15, 2017 thorax and lumbar MRIs as pertinent test results, noting the results were "Abnormal see reports." (*Id.* at 2040.) However, Dr. Bernaiche's records state that the April 4, 2017 X-ray showed "[n]o evidence of spondylolisthesis" and that Rheumatologist Dr. Demello found "no evidence of ankylosing spondylitis" during an April 7, 2017 consultation. (*Id.* at 2033-34; *see also id.* at 2636.)

Defendant asked a third-party vendor to select an independent board-certified physician to evaluate the medical evidence, and the vendor retained Dr. Frank Polanco, MD. On June 29, 2019, Dr. Polanco issued a report after reviewing the medical records. (*Id.* at 1798-1806.)[1] Dr. Polanco opined that Plaintiff "is limited in his ability to perform frequent, prolonged, and strenuous physical/work activities," but "the findings do not reflect that he is incapacitated or incapable of full-time, modified work activities as he retains a normal gait, mobility, strength, and has no focal neurological deficits." (*Id.* at 1805.) Specifically, Dr. Polanco found the following restrictions were supported by the medical records:

> walking and standing up to 20 minutes at one time for each activity and 2.5 hours total in a workday for each activity; sitting up to 8 hours at one time and 8 hours total per workday; occasional crawling, kneeling, climbing, stooping, and bending. Occasional above hand reaching, frequent reaching at and below desk level, gripping, grasping, and fingering. Occasional lifting and carrying up to 35 lbs and occasional push/pull up to 50lbs.

(*Id.* at 1803.) Ultimately, Dr. Polanco opined that Plaintiff "can work 5 days per week, 8 hours per day, within the above restrictions." (*Id.* at 1805.)

On July 2, 2019, Defendant requested that Plaintiff's providers review Dr. Polanco's report and provide comments in response. (*Id.* at 1771, 1786.) Dr. Marc Goldman, a gastroenterologist,

[1] In addition, Dr. Polanco called Dr. Bernaiche and Dr. Marc Goldman, Plaintiff's gastroenterologist, but they did not return Dr. Polanco's calls. (*Id.* at 1798-99.)

responded on July 3, 2019, stating: "Patient has no disabling issues from a GI standpoint. He does have acute issues arise but nothing chronic." (*Id.* at 1786.) Dr. Bernaiche responded on July 8, 2019, stating: "I disagree with sitting 'Restrictions' of up to 8 hours at one time and 8 hours total per workday. I recommend sitting of one hour maximum at one time maximum of 4 hours/workday. Occasional lifting and carrying of '25 pounds.' Occasional push/pull up to 35 pounds." (*Id.* at 1771.)

On August 20, 2019, Defendant informed Plaintiff that it had approved his claim for LTD benefits. (*Id.* at 218.) Defendant explained that "[f]or the period of October 23, 2018 through October 22, 2020, you must be Disabled from Your Occupation in order to be eligible for LTD benefits." (*Id.* at 219.) However, "[a]s of October 23, 2020," Defendant explained, "you must be Disabled from performing Any Occupation in order to remain qualified for LTD benefits." (*Id.*) Defendant also explained that "[o]n a periodic basis we will be providing you with supplementary claim forms for the purpose of furnishing us with continued proof of Disability." (*Id.* at 220.)

In advance of the Policy's change from "Your Occupation" to "Any Occupation," Defendant requested that Genex Services, LLC, a third-party vendor, provide a Labor Market Survey, in light of Plaintiff's previous work as a registered nurse. (*Id.* at 1484.) On June 30, 2020, Genex Services, LLC identified various sedentary nurse and medical positions in the national economy which met Plaintiff's wage replacement requirement, including: nurse consultant, utilization review coordinator, cardiac monitor technician, call center nurse, nurse case manager, triage nurse, and nurse recruiter. (*Id.* at 1485.)

In April of 2020, Plaintiff began pain management treatment with Dr. Robert Boolbol, MD. (*Id.* at 1596.) During an August 11, 2020, in-office appointment, Dr. Boolbol noted that Plaintiff had an antalgic gait and limited spine mobility but normal posture, strength, and muscle tone. (*Id.* at 1585.) Dr. Boolbol stated that Plaintiff was "tolerating meds well no side effects or symptoms in the past month." (*Id.* at 1586.) Dr. Boolbol also noted that Plaintiff "brought in disability forms today,

[but] I explained to patient due to him being . . . new I'm not comfortable filling out the forms, pt understands." (*Id.*)

In both July and October of 2020, Plaintiff had telehealth visits with his primary care physician, Dr. Cyril Joseph, MD. (*Id.* at 1622, 1628.) On October 13, 2020, Dr. Jospeh provided an APS, which stated that Plaintiff had osteoarthritis, hypertension, and "pain in multiple joints" and is "followed by pain doctor." (*Id.* at 1620.) In the restrictions and limitations section of the APS, Dr. Jospeh wrote: "unknown, pain doctor should complete." (*Id.* at 1621.)

On August 5 and 19, September 2, 9, 10, and 24, and October 6 and 9, 2020, Defendant requested information from Dr. Boolbol, but he did not respond. (*Id.* at 248, 263, 273, 276, 287, 298, 301.) Similarly, on August 19, and September 24, 2020, Defendant requested that Plaintiff provide records from Dr. Boolbol and an APS, but Plaintiff did not respond either. (*Id.* at 259, 296.)

As a result, on October 31, 2020, Defendant notified Plaintiff that it had denied Plaintiff LTD benefits beyond October 23, 2020, when the Policy changed from requiring disability from "Your Occupation" to "Any Occupation." (*Id.* at 307.) Defendant quoted the Policy's definition of "Proof of Loss" as well as a provision regarding "Termination of Payment," which stated that "[b]enefit payments will stop on the earliest of: 1) the date You are no longer Disabled; 2) the date You fail to furnish Proof of Loss." (*Id.* 307-08.) In addition, Defendant stated it had advised Plaintiff in the August 19, 2020 letter "that additional information was needed for the ongoing review of your LTD claim," including an APS "completed by your current treating physician and copies of your medical records from all treating providers for the period of 03/01/2020-present." (*Id.* at 308.) Defendant also referenced phone conversations in August and October of 2020 in which Defendant advised Plaintiff about the missing information needed as well as the September 24, 2020 letter requesting the information and warning Plaintiff that his claim would be closed if the information was not provided by October 23, 2020. (*Id.*)

On November 9, 2020, Dr. Boolbol sent the missing medical records to Defendant. (*Id.* at 1596.) These records included a Visit Note from October 12, 2020, with Nurse Practitioner Sandra Anderson, which stated Plaintiff reported pain intensity of 8 out of 10, "improved with rest, better with meds, and worsens with activity." (*Id.* at 1578.) Plaintiff had received treatment in the form of a thoracic medial branch block injection on September 9, 2020, but he reported only "minimal relief" from the procedure on October 12, 2020. (*Id.*)[2] Plaintiff also reported that he walked each day for five minutes, and he denied "any side effects with meds." (*Id.* at 1579.) The Visit Note stated Plaintiff had an antalgic gait, limited spinal range of motion, and a positive facet loading test, but it also noted he had normal posture, 5 out of 5 strength, and normal sensation, muscle tone, reflexes, and coordination. (*Id.*) However, Dr. Boolbol did not provide an APS.

Instead, on December 8, 2020, Dr. Joseph submitted a new APS, dated November 16, 2020. (*Id.* at 1573.) This new APS stated Plaintiff could never bend at the waist, kneel/crouch, climb, balance, drive, lift, reach, or perform fine or gross manipulation. (*Id.* at 1574.) But the APS did not include any sitting, standing, or walking limitations, and it did not reference any findings or imaging to support the restrictions Dr. Joseph included. (*Id.*) On December 21, 2020, Defendant sent a letter to Dr. Joseph requesting clarification regarding Plaintiff's ability to perform sedentary work. (*Id.* at 312.) In the letter, sedentary work was defined as involving "primarily sitting with ability to change positions as needed for comfort, walking/standing for brief periods of time, occasionally lift up to 10 pounds at desk level, frequent use of arms to reach at desk level, non-weight bearing, such as to answer a phone and frequent use of hands to perform fine and gross motor skills." (*Id.* at 312.) Dr. Joseph did not respond to this letter.

---

[2] On the next page, the October 12, 2020 Visit Note stated Plaintiff did not receive "any relief of his pain" from the thoracic medial block branch injection. (*Id.* at 1579.) The Visit Note from September 9, 2020, when Plaintiff received the thoracic medial block branch injection, stated that Plaintiff "reported 50% immediate benefit from today's diagnostic procedure." (*Id.* at 1582.)

Nevertheless, in light of the new medical information submitted, Defendant informed Plaintiff on January 6, 2021, that it would continue to pay benefits while it concluded its investigation. (*Id.* at 315.) However, Defendant stated it "reserve[d] all rights and defenses available to us in making our determination" and that "[a]dditional benefits paid beyond 10/23/2020, should not be construed as an admission of continued liability." (*Id.* at 315.)

Defendant then requested that third-party vendor Reliable Review Service ("RSS") refer a board-certified physician in orthopedic surgery to perform a review of Plaintiff's medical records. (*Id.* at 1572.) RSS selected Orthopedic Surgeon Dr. Aaron Morgenstein, who reviewed Plaintiff's medical records and had a phone conversation with Dr. Joseph on January 13, 2021. Dr. Morgenstein asked for Dr. Jospeh's "overall opinion of [Plaintiff's] functional ability at this time," and Dr. Joseph responded that he "[d]oes think [Plaintiff] can do a seated job. Dr. Jospeh said [Plaintiff] will likely have persistent neck and back pain." (*Id.* at 1560.)[3] Dr. Jospeh also mentioned that Plaintiff had "[s]ome intermittent antalgic gait seen at clinic" and "had difficulty with prolong/long distanc[e] walking, standing, and sitting." (*Id.*) On the other hand, Dr. Jospeh reported no knowledge of any weakness or strength issues, persistent swelling that affects function, or use of braces or assistive devices. (*Id.* at 1559-60.) Dr. Jospeh additionally reported that Plaintiff "can take care of himself and go grocery shopping for himself." (*Id.* at 1560.)

Dr. Morgenstein reviewed Plaintiff's October 12, 2020 evaluation by Sandra Anderson, explaining that her "findings suggest no signs of radiculopathy" and "support that [Plaintiff] can perform activities of daily living and sedentary physical demand activities." (*Id.* at 1561.) Dr. Morgenstein also reviewed advanced imaging of Plaintiff's thoracic and lumber spine, which, according to Dr. Morgenstein, also "support that [Plaintiff] can perform activities of daily living and

[3] Dr. Morgenstein also reported: "Although Dr. Jospeh found it difficult to speculate about full-time employment, he felt it was likely the claimant could perform sedentary work full-time." (*Id.* at 1568.)

sedentary physical demand activities." (*Id.*) In particular, Dr. Morgenstein noted there was "no evidence of thoracic spine compression fracture, central stenosis or neural foraminal stenosis" shown on a May 7, 2019 MRI of the thoracic spine. (*Id.*) Further, Dr. Morgenstein stated MRI findings of the lumbar spine on March 15, 2017 "support mild-moderate degenerative changes of the thoracic and lumbar spine," but "[t]here was no signs of nerve impingement." (*Id.*) According to Dr. Morgenstein, these MRI findings "demonstrate common, chronic, findings of individuals over 50 years old. These findings of moderate spinal arthritis support that [Plaintiff] can perform activities of daily living and sedentary physical demand activities." (*Id.*)

Dr. Morgenstein ultimately opined that Plaintiff "would be expected to perform sedentary work-related activities." (*Id.* at 1563.) Specifically, Dr. Morgenstein found Plaintiff had the "ability to perform computer related activities such as using a mouse"; he "could frequently lift, carry, and pull up to 5 lbs"; "could occasionally lift, carry, and pull up to 20 lbs"; and "could rarely lift, carry, and pull up to 30 lbs." (*Id.*) He found Plaintiff "can sit for up to 50 minutes every hour" but "then requires positional change at least 10 minutes break every hour"; "[t]herefore, [Plaintiff] can sit up to 7 hours per day in an 8-hour work day." (*Id.* at 1564.) Dr. Morgenstein also found Plaintiff "can stand or walk for no longer than 10 minutes at a time," he "should rarely walk more than 100 yards at one time," and "should be able to walk for up to 10 minutes/hour"; "[t]herefore, [Plaintiff] can walk 1 hour for every 8 hour work day." (*Id.*) Moreover, Dr. Morgenstein found Plaintiff "would be expected to rarely squat, bend at waist, kneel/crouch, or be asked to get in and out of chair," and he "would be expected to be able to ascend or descend 1 flight of stairs every hour." (*Id.*) Dr. Morgenstein opined that Plaintiff "should have the ability to perform unlimited household duties within the house such as cooking, dishes, laundry, washing/folding cloth[e]s, and vacuuming"; he "would have no restrictions related to walking or standing related to activities performed within his house" and "would be expected to occasionally squat or bend over with household chores

performed within the house"; but he "would not be expected to do any significant outdoor activities such as mowing the lawn, shoveling snow, gardening, or painting," which "activities could be performed rarely." (*Id.* at 1563.) Dr. Morgenstein additionally opined that Plaintiff "would be expected to be able to occasionally drive a car," including "up to 2.5 hours of drive time per day with no more than 30 minutes of driving at one time" and with "at least 30 minutes break or positional change between driving episodes." (*Id.*) Dr. Morgenstein concluded:

> Based on the available information and my professional experience, it is this independent reviewer's opinion that [Plaintiff] could work full-time with the restriction/limitation as listed above. There are physical examination findings that provide objective evidence that the claimant requires restrictions and limitations. There is no objective evidence either on physical examination, advanced imaging, or nerve studies to suggest that [Plaintiff] is unable to work an 8-hour day, 40 hours per week, with the above listed restrictions and limitations.

(*Id.* at 1568.)

On January 22, 2021, Katye Tuttle, a Vocational Case Manager for Defendant, submitted an Employability Analysis based on Plaintiff's education, training, work history, and functional capabilities (as found by Dr. Morgenstein). (*Id.* at 40.) The report identified sedentary occupations that Plaintiff could perform, such as medical-voucher clerk and dispatcher. (*Id.* at 43.) The Employability Analysis also referenced the occupations identified in the Genex Services, LLC Labor Market Survey from June 30, 2020, and confirmed that those "occupations exist in the national economy." (*Id.* at 44.)

As a result, Amy Thurmes, Senior Ability Analyst for Defendant, sent Plaintiff a letter explaining that his claim for LTD benefits was denied because Defendant "determined that you do not meet the policy definition of Disability beyond 1/22/2021." (*Id.* at 319.) Thurmes explained that Defendant reviewed Plaintiff's file "as a whole," including the employer and employee sections of the Application for Long Term Disability Income Benefits, the APSs completed by Dr. Joseph, office notes and medical records from Dr. Joseph and Dr. Boolbol, the review completed by Dr.

Morgenstein, the Employability Analysis, and Plaintiff's education, training, and experience. (*Id.* at 321.) Next, Thurmes explained that the definition of Disability under the Policy changed to Any Occupation as of October 23, 2020. (*Id.* at 322.) Thurmes also explained that "[t]he medical information provided inconclusive restriction and your claim was referred for a peer review," which found Plaintiff had "no restrictions related to non-weight bearing upper extremity activities"; "can frequently lift, carry, and pull up to 5lbs and occasionally up to 20lbs"; "should avoid lifting objects from ground level to waist"; "should avoid lifting objects above shoulder level"; "can sit for up to 50 minutes/hour and require positional change at least 10 minutes/hour, totaling 8 hours per 8 hour word day"; "can stand or walk for no longer than 10 minutes/hour for a total of 1 hours per 8 hour work day"; and is "physically capable of participating in an 8 hour work day for 40 hours per work week." (*Id.*) Thurmes then explained that the Employability Analysis "showed that there are a number of occupations for which you are qualified that are within your physical capabilities" and listed sample occupations along with their monthly average wages. (*Id.*) "Based on this information," Thurmes explained, "we have concluded that you are not prevented from performing the essential duties of Any Occupation. Because of this, you will not meet the policy definition of Disability as of 1/22/2021 and your LTD benefits will terminate on that date." (*Id.*)

In addition, Thurmes' denial letter explained the appeal process:

> The Employee Retirement Income Security Act of 1974 (ERISA) gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred and eighty (180) days from the later receipt of the letter or the end of benefits. Your appeal letter should be signed, dated and clearly state your position. . . . Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim. If you would like us to consider information pertaining to your Social Security Disability claim, please provide it to us as soon as possible.

> Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal.

(*Id.* at 323.) Thurmes' letter also explained that "[d]ue to COVID-19, your appeal deadline, as set forth in the attached letter, will be tolled from the period of March 1, 2020 until 60 days after the end of the National Emergency declaration." (*Id.* at 324.)[4]

On July 12, 2021, Plaintiff's counsel submitted a notice of appeal on Plaintiff's behalf and requested certain documents relevant to the appeal. (*Id.* at 1474-46.) On August 3, September 3, and October 31, 2021, Plaintiff's counsel sent letters requesting additional time to submit appeal materials and reiterated the requests for relevant documents. (*Id.* at 1460-61, 1465-66, 1470-71.) On March 4, 2022, Plaintiff's counsel submitted a 13-page letter of appeal, which included arguments regarding Plaintiff's eligibility for LTD benefits, along with 14 pages of medical records and statements by Plaintiff and his family. (*Id.* at 1407-1457.) The medical records consisted of Visit Notes from September 9, 2020 and June 15, 2021, when Plaintiff received thoracic medial block branch injections, and Visit Notes from January 13, 2021, March 2, 2021, and August 10, 2021, when Plaintiff received lumbar epidural injections. The September 9, 2020 Visit Note states there were no complications and "patient reported 50% immediate benefit from . . . procedure." (*Id.* at 1434.) The other Visit Notes do not reference any complications, results, or restrictions. In addition, the letter of appeal referenced a social security disability award, but it did not include the decision or any specific information concerning the award.

On March 11, 2022, Nancy Hyndman, an Appeal Specialist for Defendant, requested that an outside vendor, Brown & Brown, refer physicians board-certified in gastroenterology and physical

[4] Thurmes' denial letter additionally explained that Defendant "has policies and procedures in place to insulate the claims and appeals processes from any financial interest," including segregation of appeals administrators from the financial department, not compensating claims and appeals administrators based on denial rates, and using third-party vendors to select experts for peer reviews. (*Id.*) The letter also stated: "All claims and appeals for disability benefits are to be adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision." (*Id.* at 323.)

medical and rehabilitation ("PM&R") and pain medicine to review Plaintiff's records. (*Id.* at 1399.) On March 12, 2022, Dr. Sabeen Medvedev, MD, Gastroenterology, issued a report, opining: "From the medical records, it is clear that the claimant has no restrictions or limitations and has full functional capabilities from a GI standpoint from 1/23/21 to present." (*Id.* at 1336.) Dr. Medvedev also stated that "[n]o GI self-report symptoms, fatigue, cognitive issues, or GI medication side effects contribute to any impact on the functional status of the claimant per the medical records." (*Id.*) On March 24, 2022, Dr. Neil Patel, MD, PM&R and Pain Medicine, issued a report, opining:

> The claimant's most recent MRI done on May 7, 2019, of the thoracic spine showed no evidence with thoracic spine, central stenosis or neural foraminal stenosis with age-appropriate degenerative changes. The claimant is neurologically intact. The medical records do not have any up-to-date physical examination findings to support impairments. Diagnostic and/or radiological studies along with the claimant has full-time capacity without any restrictions and limitations.

(*Id.* at 1331.) In addition, Dr. Patel noted that "[t]he medical records do[] not provide any self-reported symptoms, fatigue or any cognitive issues secondary to the claimant's medication side effects." (*Id.* at 1332.)

Ms. Hyndman sent both reports to Plaintiff's counsel on March 24, 2022 and requested that any response be sent by April 14, 2022. (*Id.* at 352.) Ms. Hyndman sent letters to Plaintiff's counsel on April 8, April 26, and May 5, 2022, extending the time to respond to the reports, as requested by Plaintiff's counsel. (*Id.* at 354-59.) On June 9, 2022, after the last extension of time expired on June 6, 2022, Ms. Hyndman left Plaintiff's counsel a voicemail inquiring whether any additional information would be provided or if Defendant should instead proceed with its review. (*Id.* at 7.) Plaintiff's counsel did not respond. (*Id.*)

On June 16, 2022, Ms. Hyndman sent Plaintiff's counsel a letter stating that Defendant had completed the appeal review and upheld the denial decision. (*Id.* at 360.) In response to Plaintiff's counsel's argument that Defendant, in denying LTD benefits, was required to identify specific information needed for a favorable appeal outcome, Ms. Hyndman explained:

> The decision to limit your client's benefits was based on a review of the complete administrative record at the time and not due to a lack of proof of loss[;] therefore the claim office was not aware of any information that might be needed to perfect the claim. The ERISA regulation does not require the Hartford to identify or describe specific types of evidence or information that would lead to a finding that the claimant is entitled to benefits.

(*Id.* at 361.) Ms. Hyndman additionally addressed Plaintiff's counsel's argument that Defendant should have sent Plaintiff for an independent medical examination ("IME"), explaining that although IMEs "can be a very effective tool in determining ongoing disability, . . . due to the fact that your client's claim was terminated over a year ago, we determined that an IME would not provide an accurate reflection of your client's function for the time frame under consideration." (*Id.* at 362.)

Ms. Hyndman noted the independent medical opinions of Dr. Medvedev and Dr. Patel, including that both doctors stated the medical records do not support that Plaintiff experienced medication side effects. (*Id.* at 362-63.) In addition, Ms. Hyndman "acknowledge[d] that [Plaintiff] may not be able to return to his own physically demanding job which required frequent driving and providing direct patient care, however The Hartford's Vocational Counselor has identified multiple sedentary occupations that [Plaintiff] can perform given his education, training, and experience," and the "demands of these occupations would allow for changed in position for comfort." (*Id.* at 363.) Ms. Hyndman also addressed Plaintiff's approval for Social Security Disability ("SSDI") benefits and explained that the standards for SSDI benefits differ in critical ways from the standards for LTD benefits under the Policy. (*Id.* at 364-65.)[5] Lastly, Ms. Hyndman explained that Defendant's "claim

---

[5] Ms. Hyndman further explained that Defendant does "not know when the [Social Security Administration] last followed up with [Plaintiff] since benefits were approved in 2019 or what evidence they considered in continuing benefit payments." (*Id.*) Again, the appeal letter submitted by Plaintiff's counsel referenced a social security disability award, but it did not include the actual decision or any specific information regarding the award.

decision is now final as administrative remedies available under the Policy have been exhausted." (*Id.* at 366.)[6]

Almost nine months later, on March 13, 2023, Plaintiff's counsel sent a letter along with a report prepared by Walter Panis, MD, a psychiatrist who conducted a remote examination of Plaintiff on February 24, 2023. (*Id.* at 869.) On March 23, 2023, Ms. Hyndman responded to Plaintiff's counsel's submission, explaining that the final appeal decision was made on June 16, 2022, "the administrative remedies provided by ERISA and the plan have been exhausted," and "[t]here are no provisions for additional appeals or re-opening the administrative record after a final appeal decision." (*Id.* at 367.) Therefore, Ms. Hyndman explained, "[t]he additional information submitted will not be reviewed by" Defendant. (*Id.*)

Thereafter, Plaintiff brought this action, and the parties filed cross-motions for summary judgment based on the administrative record.

## III. Standard of Review

As the parties agree, the LTD Policy provides Defendant with discretionary authority to determine benefit eligibility. (A.R. at 2763.) Accordingly, a deferential standard of review applies, under which the administrator's decision will be upheld unless it is "arbitrary, capricious, or an abuse of discretion." *Ortega-Candelaria v. Johnson & Johnson*, 755 F.3d 13, 20 (1st Cir. 2014) (quoting *Cusson v. Liberty Life Assur. Co. of Bos.*, 592 F.3d 215, 224 (1st Cir. 2010)); *see also Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013) (explaining that, in the ERISA context, the phrases "abuse of discretion" and "arbitrary and capricious" are "equivalent"). "Whatever label is applied, the relevant standard asks whether a plan

[6] Ms. Hyndman also recounted that Defendant had extended the time for Plaintiff's counsel to respond to the independent medical reports of Dr. Medvedev and Dr. Patel until June 6, 2022, and noted: "We called your office on 06/09/2022 and left a message requesting a return call to discuss the status of your appeal. We have not received a return call, additional information, or a further request for an extension therefore we have completed our review." (*Id.* at 363.)

administrator's determination 'is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'" *Colby*, 705 F.3d at 61 (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002)); *see also Arruda v. Zurich Am. Ins. Co.*, 951 F.3d 12, 22 (1st Cir. 2020) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary." (internal quotation marks omitted)). While this standard is deferential, it does not mean "no review at all." *Id.* at 62. "In short," the plan administrator's decisions "must be reasonable." *Id.*

"It also bears emphasis that this standard of review, which concerns a fiduciary element of the role of an ERISA plan administrator, must reflect the relevant principles of trust law, rather than the law of contracts." *D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co.*, 640 F.3d 27, 37 (1st Cir. 2011); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (explaining that "ERISA imposes higher-than-marketplace quality standards on insurers," under which a plan administrator must "'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan" (quoting 29 U.S.C. § 1104(a)(1))). In this regard, the First Circuit has framed the inquiry as follows: "To what extent has [Defendant] conducted itself as a true fiduciary attempting to fairly decide a claim, letting the chips fall as they may?" *Lavery v. Restoration Hardware Long Term Disability Benefits Plan*, 937 F.3d 71, 79 (1st Cir. 2019). "To the extent [Defendant] has not so conducted itself in deciding [Plaintiff's] claim," the First Circuit explained it "would tend to move in the direction of viewing its decision as arbitrary and capricious rather than fair and reasoned." *Id.*

Moreover, as the parties also acknowledge, the fact that Defendant was "in the position of both adjudicating claims and paying awarded benefits" means it had a structural conflict of interest. *Denmark v. Liberty Life Assur. Co. of Boston*, 566 F.3d 1, 7 (1st Cir. 2009) (citing *Glenn*, 554 U.S. at 112-14). Although such a conflict does not change the standard of review to *de novo*, it is "one factor

among many that a reviewing judge must take into account." *Glenn*, 554 U.S. at 116. Accordingly, a structural conflict of interest should be considered in the same way as other, "often case specific, factors" are weighed: "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.* at 117. The Supreme Court has explained that a "conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* But "[i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.* Another important factor recognized by the Supreme Court in *Glenn*, to be weighed alongside a conflict of interest, is "procedural unreasonableness." *Id.* at 118; *see Lavery*, 937 F.3d at 78.[7]

## IV. ANALYSIS

The court concludes, after a review of the administrative record as a whole and considering the parties' arguments in support of their cross-motions, that Defendant's decision to terminate Plaintiff's LTD benefits was not arbitrary, capricious, or an abuse of discretion. Rather, Defendant's decision was supported by substantial evidence in the record.

Plaintiff raises a number of arguments, but the court is not persuaded. He argues, for example, that Defendant failed to provide adequate guidance regarding the administrative appeal, relied on Dr. Morgenstein's opinion despite the inconsistency between the driving and sitting

[7] Although the parties have filed cross-motions for summary judgment, "motions for summary judgment in this context are nothing more than vehicles for teeing up ERISA cases for decision on the administrative record" and, as such, "[t]he burdens and presumptions normally attendant to summary judgment practice do not apply." *Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.*, 813 F.3d 420, 425 n.2 (1st Cir. 2016).

restrictions, failed to credit Plaintiff's reports of pain and medication side effects, improperly refused to consider Dr. Panis's report, illegally relied on physicians not licensed to practice in Massachusetts, and acted unfairly due to Defendant's structural conflict of interest.

Plaintiff asserts Defendant's January 22, 2021 denial letter "failed to describe with even a minimal level of detail what [Plaintiff] should include in his appeal" and, as a result, Plaintiff "was left guessing what information would allow [Defendant] to assess his claim fairly on appeal." (Dkt. No. 56 at 18.) Plaintiff also asserts that Defendant relies on new grounds not previously asserted at the administrative level in arguing, in the summary judgment briefing, that Plaintiff's LTD benefits were properly terminated due to lack of objective evidence of restrictions preventing him from sedentary work. In response, Defendant argues the denial letter complied with ERISA's notice requirements, and it has not engaged in impermissible post-hoc rationalization. The court agrees with Defendant.

Under 29 U.S.C. § 1331, benefit plans are required to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). In addition, the applicable regulations require the notice to include: "A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(iii). "The notice requirements of ERISA are designed to 'insure that when a claimant appeals a denial to the plan administrator, [he] will be able to address the determinative issues and have a fair chance to present [his] case.'" *Niebauer v. Crane & Co.*, 783 F.3d 914, 927 (1st Cir. 2015) (quoting *DiGregorio v. Hartford Comprehensive Emp. Benefit Serv. Co.*, 423 F.3d 6, 14 (1st Cir. 2005)). "This purpose is the lodestar in determining whether there has been substantial compliance with the notice provisions; strict compliance is not required." *Id.*; *see also Santana-Diaz v. Metro. Life Ins. Co.*, 816 F.3d

172, 182 (1st Cir. 2016). Instead, courts "ask whether 'the beneficiary [was] supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review.'" *Niebauer*, 783 F.3d at 14 (quoting *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998)); *see also Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 526 (1st Cir. 2005) ("The denial letter need not detail every bit of information in the record; it must have enough information to render the decision to deny benefits susceptible to judicial review."). Moreover, "[a] claimant typically must demonstrate that he or she has been prejudiced as a result of the notice's inadequacy." *Id.*

Importantly, the First Circuit, in addressing the regulation's requirement of "[a] description of any additional material or information necessary for the claimant to perfect the claim," has explained that "perfect the claim" is not "synonymous with 'win the appeal.'" *Terry*, 145 F.3d at 39; *see also Santilli v. Hartford Life and Accident Ins. Co.*, 795 F. Supp. 3d 232, 242 (D. Mass. 2025) ("The First Circuit has made clear, however, that this regulation does not require the administrator to tell the claimant how to 'win the appeal.'" (quoting *Terry*, 145 F.3d at 39)). "Rather, perfecting a claim refers to complet[ing] a claim—and a complete claim can still be denied." *Fisher v. Harvard Pilgrim Health Care of New England, Inc.*, 380 F. Supp. 3d 155, 165 (D. Mass. 2019) (internal quotation marks omitted); *see Terry*, 145 F.3d at 39 n.8. "In other words, the regulation does not require that an administrator make any suggestion to [the claimant] as to what type of information might be helpful in appealing [its] determination." *Fisher*, 380 F.Supp. 3d at 165. (internal quotation marks omitted).

Here, the denial letter included the relevant Policy provisions, listed the relevant records reviewed, and explained that "[t]he medical information provided inconclusive restrictions and your claim was referred for a peer review." (A.R. at 322.) The letter then set forth the specific restrictions found by the peer reviewing physician, including that Plaintiff could "sit for up to 50 minutes/hour and require[s] position change at least 10 minutes/hour" and was "physically capable of participating

in an 8 hour work day for 30 hours per work week." (*Id.*) The letter next listed sample occupations for which he was qualified and which fit within Plaintiff's physical capabilities and met Plaintiff's wage replacement requirement under the Policy. In addition, the letter explained the appeal process and stated that Plaintiff "may submit written comments, documents, records and other information related to your claim," as well as "information pertaining to your Social Security Disability claim," which Defendant requested Plaintiff provide "as soon as possible" if he wanted Defendant to consider it. (*Id.* at 323.) The court concludes that "[t]his explanation, which clearly outlines the reason for [Defendant's] decision, satisfies ERISA's notice requirements." *Niebauer*, 783 F.3d at 927; *see also Santilli*, 795 F. Supp. 3d at 242 (addressing similar denial letter language and concluding "these directions were sufficient to allow Santilli to perfect his claim").

Moreover, "[e]ven if there were a technical defect, [Plaintiff] has not shown that a more precise form of notice would have altered the outcome." *Santilli*, 795 F. Supp. 3d at 242. That is, Plaintiff has not demonstrated "that his understanding of the issues at stake was so muddled as to inhibit effective review." *Niebauer*, 783 F.3d at 928. In fact, Plaintiff submitted additional medical records on appeal with the apparent intention of supplying objective medical evidence in support of his claimed disability from any occupation, suggesting "he was well aware of the reasons for the decision, and was submitting additional evidence on the crucial point." *Terry*, 145 F.3d at 39; *see also Niebauer*, 783 F.3d at 927-28. The denial letter therefore supplied Plaintiff "with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Niebauer*, 783 F.3d at 927 (internal quotation marks omitted).

The court also rejects Plaintiff's argument that Defendant engaged in impermissible post-hoc rationalization by raising new arguments in litigation which were not raised during the administrative review. Plaintiff is correct that post-hoc reasoning is prohibited: "a plan administrator, in

terminating or denying benefits, may not rely on a theory for its termination or denial that it did not communicate to the insured prior to litigation." *Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.*, 852 F.3d 105, 113 (1st Cir. 2017). But the court agrees with Defendant that "[t]his case presents no such shifting rationale." (Dkt. No. 74 at 14.) Plaintiff cites *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 3d 113 (1st Cir. 2004), in support of his post-hoc rationalization argument but, as Defendant argues, *Glista* is distinguishable. In *Glista*, the defendant relied on one specific policy clause in denying benefits but then raised another clause as well during litigation. *Id.* at 129-30; *see also Ministeri v. Reliance Standard Life Ins. Co.*, 42 F.4th 14, 28 (1st Cir. 2022) ("Reliance's written denial letters to the plaintiff discuss only the issue of Ministeri's qualification for the eligible class; they are silent on portability."). Here, in contrast, Defendant has consistently explained that it terminated Plaintiff's LTD benefits under the "Any Occupation" definition because the record did not support that his restrictions prevented him from performing sedentary work. Accordingly, "[t]his case is a far cry from Glista, in which the insurer articulated an entirely new basis for the denial of benefits for the first time in litigation." *Dutkewych v. Standard Ins. Co.*, 781 F.3d 623, 638 (1st Cir. 2015); *cf. R.R. v. California Physicians' Serv.*, 2026 WL 207507, at *5 (9th Cir. Jan. 27, 2026) ("There is a difference between offering a new rationale and offering new evidence to bolster an existing rationale. . . . [A]n administrator may cite evidence in litigation that it had not cited during the administrative process, so long as that evidence supports the same underlying legal theory.").

Plaintiff also faults Defendant for relying on Dr. Morgenstein, even though he opined that Plaintiff could only drive 2.5 hours per day and no more than 30 minutes at a time, yet he also opined that Plaintiff could sit for up to 7 hours in a work day. The court fails to see the purported inconsistency here. As Defendant argues, sitting at a desk (with the ability to change positions and sit and stand at will) and driving in a car (with limited ability to reposition) are very different experiences. Accordingly, contrary to Plaintiff's arguments, there was no need for either Dr.

Morgenstein or Defendant to explain the discrepancy. Moreover, unlike Plaintiff's nurse position at Trinity Health Corporation, where driving to patients' homes was a significant job duty, the positions identified by Defendant under the "Any Occupation" standard did not include driving requirements. *See, e.g., Storms v. Aetna Life Ins. Co.*, 156 F. App'x 756, 759 (6th Cir. 2005) ("[I]nability to drive to work does not typically constitute a material and substantial job responsibility.").

Plaintiff next argues that Defendant abused its discretion by failing to credit his subjective reports of pain and medication side effects. The First Circuit has held that "requiring objective evidence of the functional limitations resulting from a claimant's conditions . . . is permissible." *Ovist v. Unum Life Ins. Co. of Am.*, 14 F.4th 106, 118 (1st Cir. 2021) (citation omitted); *see also Cusson v. Liberty Life Assur. Co. of Bos.*, 592 F.3d 215, 227 (1st Cir. 2010) ("Because it is permissible to require documented, objective evidence of disability, it was not inappropriate for Liberty's reviewers to rely on the lack of such documented evidence, . . . in making their recommendations."); *Desrosiers v. Hartford Life & Acc. Co.*, 515 F.3d 87, 93 (1st Cir. 2008) ("[I]t is permissible to require objective support that a claimant is unable to work as a result of . . . conditions [that do not lend themselves to objective verification]."). Moreover, "a patient's subjective claims of disability do not acquire objectivity or independence merely by virtue of being transcribed in a doctor's note." *Prince v. Metro. Life Ins. Co.*, 2010 WL 988730, at *12 (D.N.H. Mar. 16, 2010); *see also Sargent v. Sun Life Assurance Co. of Canada*, 2026 WL 1506231, at *10 (D. Mass. May 29, 2026). Here, Defendant and the peer reviewing physicians considered Plaintiff's subjective reports, but they simply "determined that the evidence did not satisfactorily prove that [Plaintiff] was eligible for LTD benefits under the Plan." *Santana-Diaz v. Metropolitan Life Ins. Co.*, 919 F.3d 691, 696 (1st Cir. 2019). The peer reviewing physicians and Plaintiff's own physicians noted on multiple occasions that Plaintiff denied medication side effects. They also noted that Plaintiff could perform activities of daily living, such as grocery shopping. In addition, Plaintiff's primary care physician, Dr. Joseph, stated he thought

Plaintiff could work a sedentary job, despite his medical conditions and limitations. The court finds no abuse of discretion in Defendant's consideration of Plaintiff's reports of pain and medication side effects.

Plaintiff additionally faults Defendant for not considering the report prepared by Dr. Panis almost nine months after Defendant upheld the denial decision on appeal. However, this court granted Defendant's motion to strike references to Dr. Panis's report in Plaintiff's summary judgment briefing and statements of undisputed facts, relying in part on an earlier ruling issued by Magistrate Judge Robertson finding that Dr. Panis's report was not part of the administrative record. (Dkt. No. 80.) As this court explained, in the First Circuit, "the final administrative decision acts as a temporal cut off point." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 519 (1st Cir. 2005); *see also id.* ("The claimant may not come to a court and ask it to consider post-denial medical evidence in an effort to reopen the administrative decision."). "This means that evidence collected after the final administrative decision, even if the new evidence directly concerns the question of disability before the decision, as well as evidence regarding the claimant's condition after the final administrative decision, are inadmissible." (Dkt. No. 80 (quoting Dkt. No. 46 at 10-11).) The court also noted that Plaintiff never acknowledged or appealed Judge Robertson's ruling. And the court rejected "Plaintiff's argument that the COVID-19-related tolling of the administrative appeal deadline somehow mandated that Defendant consider evidence submitted after Plaintiff already appealed and Defendant already issued its final appeal decision." (*Id.*) "Instead," the court explained, "that tolling provision simply extended the deadline for Plaintiff to file an administrative appeal in the first instance, which Plaintiff did on July 12, 2021." (*Id.*) Accordingly, the court finds no abuse of discretion in Defendant's failure to consider Dr. Panis's report.

Plaintiff also repeats another argument previously rejected by Judge Robertson in this case: that Defendant erred in relying on reviewing physicians not licensed to practice in Massachusetts. As

Judge Robertson explained, "[t]he federal regulations do not require that [consulting physicians] be licensed in the State in which the claimant resides." (Dkt. No. 46 at 13.) *See Santilli*, 795 F. Supp. 3d at 242; *Rogers v. Unum Life Ins. Co. of Am.*, 2024 WL 1455728, at *7 n.4 (D. Mass. Mar. 31, 2024); *Abi-Aad v. Umum Group*, 2023 WL 2838357, at *14 (D. Mass. Apr. 7, 2023). Moreover, the Massachusetts regulation Plaintiff relies upon, 24 C.M.R. § 2.01(4), defines "[t]he Practice of Medicine," in part, as "conduct, the purpose or reasonably foreseeable effect of which is to encourage the reliance of another person upon an individual's knowledge or skill in the maintenance of human health by the prevention, alleviation, or cure of disease, and involving or reasonably thought to involve an assumption of responsibility for the other person's physical or mental well being." Accordingly, as Judge Robertson explained, "[i]n view of the introductory passage of the definition of the practice [of] medicine, the court is not convinced that Drs. Medvedev and Patel engaged in unlicensed practice of medicine by reviewing Plaintiff's records in connection with providing a disability evaluation." (Dkt. No. 46 at 13.) *See Sargent*, 2026 WL 1506231, at *10 n.7 (agreeing with Judge Robertson's analysis). The court therefore rejects Plaintiff's argument based on unlicensed practice of medicine.

In addition, Plaintiff argues Defendant's structural conflict of interest tainted the claim process. He points to the decision to terminate benefits as well as unspecified "procedural unreasonableness" as evidence. (Dkt. No. 72 at 16.) But the court does not agree. As Judge Robertson explained, "[t]he bald fact that Defendant made an adverse benefits determination is not evidence of bias or unfair claim processing." (Dkt. No. 46 at 9.) The court also detects no procedural unreasonableness. In contrast, as Defendant argues, it took active steps to insulate the decision-making process from the structural conflict, including using outside, independent medical vendors, continuing benefits under a reservation of rights following the initial denial after receiving additional medical information from Plaintiff's physician, using a separate employee for appellate

review, and granting extensions to Plaintiff to submit documents on appeal. *See Bernitz v. Usable Life*, 149 F.4th 113, 122 (1st Cir. 2025) (explaining that the defendant's employment of "third-party vendors to select independent physicians to analyze Bernitz's medical records," use of "a separate appeals unit to review the initial denial of Bernitz's claim," and its "good-faith benefit payments under reservation of rights" diminished "the weight we place on the structural conflict"). The court therefore rejects Plaintiff's structural conflict of interest argument.[8]

In the end, while Plaintiff points to some evidence in the record supporting his contentions, "[e]vidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Bernitz*, 149 F.4th at 121 (internal quotation marks omitted); *see also Leahy v. Raytheon Co.*, 315 F.3d 11, 19 (1st Cir. 2002) ("[T]he mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious."). And here substantial evidence supports Defendant's decision.

## V. CONCLUSION

For these reasons, the court ALLOWS Defendant's Motion for Summary Judgment (Dkt. No. 58) and DENIES Plaintiff's Motion for Summary Judgment (Dkt. No. 54). The clerk is directed to issue judgment in favor of Defendant, and this case may now be closed.

It is So Ordered.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge

[8] Plaintiff also argues Defendant explicitly found that the medical records support the contention that Plaintiff's symptoms precluded full-time sedentary work, pointing to the June 16, 2022 letter upholding the denial on appeal and a subsequent May 25, 2023 letter addressing the late-submitted Dr. Panis report. (A.R. at 364, 370.) However, it is clear from the context of both letters that the statement contained a typographical error, in that it is missing the word "not" in the following sentence: "The Hartford also considered your client's subjective pain complaints in determining ongoing disability, but we found that the medical record did demonstrate clinical findings to support that your client's symptoms resulted in impairments that would preclude full-time sedentary work." (*Id.*)